No. 23-5257

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SAMUEL JOHNSON, *et al.*,

*Plaintiffs-Appellants*,

v.

KATHY GRIFFIN,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Tennessee
Case No. 3:22-cv-00295

## BRIEF OF TECHFREEDOM AS *AMICUS CURIAE*
## IN SUPPORT OF DEFENDANT-APPELLEE

Ari Cohn
Berin Szóka
Corbin K. Barthold
TECHFREEDOM
1500 K. Street NW, Floor 2
Washington, D.C. 20005
acohn@techfreedom.org

Geoffrey M. Pipoly
    *Counsel of Record*
BRYAN CAVE LEIGHTON
    PAISNER LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Geoff.Pipoly@bclplaw.com
(312) 602-5085

Annie Avery
BRYAN CAVE LEIGHTON
    PAISNER LLP
1920 Main Street, Ste. 1000
Irvine, CA 92641
Annie.Avery@bclplaw.com

Jean-Claude André
BRYAN CAVE LEIGHTON
    PAISNER LLP
120 Broadway, Ste. 300
Santa Monica, CA 60401
jcandre@bclplaw.com

Counsel for *Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5257                    Case Name: Johnson v. Griffin

Name of counsel: Geoffrey M. Pipoly

Pursuant to 6th Cir. R. 26.1, TechFreedom
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ June 14, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Geoffrey M. Pipoly

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 3

ARGUMENT .......................................................................................... 7

I.    The District Court Was Correct That Ms. Griffin's Online Comments Did Not Confer Personal Jurisdiction............................................................................... 7

    A.    The Internet Is Uniquely Speech-Enabling, and for That Reason, Congress and the Courts Have Given Online Speech Special Protections.................... 8

        1.    Section 230. ........................................................ 11

        2.    The FEC's "Internet Freedom Rule." ................ 12

        3.    Statements of Fact vs. Opinion. ........................ 13

    B.    Courts Should Consider First Amendment Concerns in Cases Like This One, in Which the Claims Arise from Online Speech.............................. 14

        1.    *Calder* Does Not Fit the Realities of Online Speech. ............................................................. 14

        2.    *Calder* Did Not Take Into Account Procedural Chilling Effects Like SLAPPs. ........ 17

        3.    The Johnsons' Broad Jurisdictional Theory Would Chill Online Speech. .............................. 19

II.    This Case Bears The Hallmarks of a Typical SLAPP. ........ 26

    A.    The Johnsons' Claims Are Legally Meritless, Which Suggests This Case is a SLAPP. ..................... 26

    B.    The Johnsons Claims Are Probably Factually Meritless, Which Suggests This Case is a SLAPP. ..... 28

    C.    The Claims The Johnsons Pleaded Here Are Exactly the Types of Claims Pleaded in a Typical SLAPP. ...................................................................... 35

CONCLUSION .................................................................................... 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelson v. Harris,*
402 P.3d 665 (Nev. 2017) .................................................................. 22

*Armstrong v. NBC,*
2012 WL 4098984 (W.D. Ky. Sept. 17, 2012) .................................... 28

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ........................................................... 11

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners, LLC,*
151 F. Supp. 3d 287 (E.D.N.Y. 2015) ................................................ 13

*Broadvoice, Inc. v. TP Innovations LLC,*
733 F. Supp. 2d 219 (D. Mass. 2010) ................................................ 23

*Brown v. Entertainment Merchants Ass'n,*
564 U.S. 786 (2011) .......................................................................... 10

*Calder v. Jones,*
465 U.S. 783 (1984) .................................................................. *passim*

*Cousins v. Goodier,*
283 A.3d 1140 (Del. 2022) ................................................................ 28

*Cutis Publishing Co. v. Golino,*
383 F.2d 586 (5th Cir. 1967) ............................................................. 24

*Directory Assistants, Inc. v. Supermedia, LLC,*
884 F. Supp. 2d 446 (E.D. Va. 2012) ................................................ 11

*Ganske v. Mensch,*
480 F. Supp. 3d 542 (S.D.N.Y. 2020) ................................................ 13

*Gonzales v. The Atlanta Constitution,* 4 Media L. Rep. (BNA)
2146 (N.D. Ill. 1979) .......................................................................... 24

# TABLE OF AUTHORITIES
## (continued)

*Gordon v. Marrone*,
  590 N.Y.S.2d 649 (Sup. Ct. 1992) ...................................................... 18

*Lord v. Smith*,
  2023 WL 3792450 (N.D. Ill. June 2, 2023) ........................................ 23

*Monge v. Univ. of Pa.*,
  2023 WL 2471181 (E.D. Pa. Mar. 10, 2023) ...................................... 11

*Nandigam Neurology, PLC v. Beavers*,
  639 S.W.3d 651 (Tenn. Ct. App. 2021) ...................................... 3, 4, 27

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .......................................................................... 20

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) .............................................................................. 8

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997) ...................................................................... 8, 10

*Ryan v. Fox Television Stations, Inc.*,
  979 N.E.2d 954 (Ill. Ct. App. 2012) .................................................. 28

*Sandals Resorts v. Google, Inc.*,
  86 A.D.3d 32 (N.Y. App. Div. 2011) .................................................. 13

*Sarver v. Chartier*,
  813 F.3d 891 (9th Cir. 2016) ............................................................... 4

*Sibley v. CarMax, Inc.*,
  2020 WL 4050294 (Md. Ct. Spec. App. July 20, 2020) ...................... 36

*Thomas v. Quintero*,
  126 Cal. App. 4th 635 (2005) ............................................................ 36

## Statutes and Regulations

47 U.S.C. § 230 .................................................................................... 11

Cal. Code Civ. Proc. § 425.16 .............................................................. 27

## TABLE OF AUTHORITIES
### (continued)

Tenn. Code Ann. § 20-17-105(a) .................................................................. 27

Unif. Pub. Expression Prot. Act § 2(b) (Unif. L. Comm'n
    2020) ............................................................................................................ 27

1989 WASH. SESS. LAWS 1119-20 .............................................................. 18

11 C.F.R. §§ 10.11 ......................................................................................... 12

11 C.F.R. § 100.155 ....................................................................................... 12

### Other Authorities

Aaron H. Caplan, *Free Speech and Civil Harassment Orders*,
    64 HASTINGS L.J. 781 (2013) .................................................................. 3

Alan M. Trammell & Derek E. Bambauer, *Personal
    Jurisdiction and the Interwebs*, 100 CORNELL L. REV. 1129
    (2015) ........................................................................................................ 14

Cassandra Burke Robertson, *The Inextricable Merits
    Problem in Personal Jurisdiction*, 45 UC DAVIS L. REV.
    1301 (2012) ............................................................................................... 16

Colin Quinlan, *Erie and the First Amendment: State Anti-
    SLAPP Laws in Federal Court after Shady Grove*, 114
    COLUM. L. REV. 367 (2014) ...................................................................... 4

Corinna Essa, *How to Effectively Use Twitter Mentions and
    @Replies for Marketing*, SOCIAL MEDIA WORLDWIDE ........................ 21

David Keating, *Estimating the Cost of Fighting a SLAPP in
    a State with No Anti-SLAPP Law*, INSTITUTE FOR FREE
    SPEECH, June 16, 2022 ............................................................................ 18

Eric Goldman, *Why Section 230 is Better Than the First
    Amendment*, 95 NOTRE DAME L. REV 33 (2019). ............................... 11

George Tinari, *Why do People Put Periods Before Usernames
    on Twitter?*, GUIDING TECH (Apr. 19, 2023) ....................................... 21

# TABLE OF AUTHORITIES
## (continued)

George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPS"): An Introduction for Bench, Bar and Bystanders*, 12 BRIDGEPORT L. REV. 937 (1992) ...................................................... 26, 35

John C. Barker, *Common Law and Statutory Solutions to the Problem of SLAPPS*, 26 Loy. L.A. L. Rev. 395 (1993)................. 29, 35

Jon Ronson, *So You've Been Publicly Shamed* (2015) ............................ 15

Juanita Darling, *Forum Shopping and the Cyber Pamphleteer: Banamex v. Rodriguez*, 8 COMM. L. & POL'Y 361 (2003) ............................................................................................. 16

Shannon Jankowski & Charles Hogle, *SLAPP-ing Back: Recent Legal Challenges to the Application of State Anti-SLAPP Laws*, COMMUNICATIONS LAWYER (Mar. 16, 2022)................. 18

*Social Media Use in 2021*, PEW RESEARCH CENTER (Apr. 7, 2021) ...................................................................................................... 8

*Slapp suit*, LEGAL INFORMATION INSTITUTE................................................ 3

Restatement (Second) of Torts § 652B cmt. c ......................................... 27

Restatement (Second) of Torts § 652D cmt. b......................................... 28

## INTEREST OF AMICUS CURIAE[1]

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible.

TechFreedom works tirelessly to defend the promise of a free and open Internet where vibrant discourse thrives across a multiplicity of diverse forums, unfettered by government overreach and un-chilled by threats of meritless litigation. Its experts write extensively about emerging threats to the online speech ecosystem. *See, e.g.*, Corbin Barthold, *In Internet Speech Cases, SCOTUS Should Stick Up for Reno v. ACLU*, TechDirt, https://tinyurl.com/2w3eu9sn (Mar. 28, 2023); Corbin K. Barthold & Berin Szóka, *No, Florida Can't Regulate Online Speech*, Lawfare, https://tinyurl.com/2p93sdcy (Mar. 12, 2021); Berin Szóka & Ari Cohn, *The Wall Street Journal Misreads Section 230 and*

---

[1]   No counsel for a party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

*the First Amendment*, Lawfare, https://tinyurl.com/3my25595 (Feb. 3, 2021).

TechFreedom frequently submits comments urging regulatory agencies to protect—not regulate—online speech, *see e.g.*, *Authority to Regulate Political Speech Should Remain Limited*, TechFreedom, https://tinyurl.com/2askj4ua (Jan. 10, 2023), and educates lawmakers on the First Amendment implications of legislative proposals. *See, e.g.*, *Utah Age Verification Mandate Violates First Amendment*, TechFreedom, https://tinyurl.com/5n8xnhpa (Feb. 16, 2023); *Journalism and Kids' Safety Bills Both Threaten the First Amendment*, TechFreedom, https://tinyurl.com/ejb3re5k (Dec. 7, 2022).

Finally, TechFreedom also appears often as *amicus curiae* where the government attempts to dictate what views are acceptable online, *see, e.g.*, *NetChoice v. Moody*, 34 F.4th 1196 (11th Cir. 2022), or to punish jokes, satire, or other speech that falls far short of the kind of "true threats" or calls to "imminent lawless action" that lack First Amendment protection, *see Bailey v. Iles*, No. 22-30509 (5th Cir. 2022); *FDRLST Media, LLC v. NLRB*, 35 F.4th 108 (3d Cir. 2022).

TechFreedom submits this brief to inform the Court's understanding of the unique nature of Internet speech and its societal importance, how excessively permissive standards for exercising personal jurisdiction over online speakers can chill speech in similar ways to lawsuits filed for the purpose of punishing or deterring protected speech, and why those chilling effects are particularly harmful in the digital age.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is a SLAPP. "SLAPP" is an acronym standing for "strategic lawsuit against public participation." *Nandigam Neurology, PLC v. Beavers*, 639 S.W.3d 651, 567 (Tenn. Ct. App. 2021) (citations and quotation marks omitted). A SLAPP is a "civil action whose primary purpose is not to enforce rights but to silence critics through the burden of litigation." Aaron H. Caplan, *Free Speech and Civil Harassment Orders*, 64 HASTINGS L.J. 781, 848 (2013); *accord SLAPP suit*, LEGAL INFORMATION INSTITUTE, https://www.law.cornell.edu/wex/slapp_suit (last visited June 12, 2023) (the term "SLAPP" "refers to lawsuits brought by individuals and entities to dissuade their critics from continuing to

produce negative publicity" including by "temporarily prevent[ing] their critics from making public statements against them").

Because a filer cannot state explicitly that their lawsuit's primary purpose is to stifle protected speech, SLAPPs typically "masquerade as ordinary lawsuits." *Nandigam Neurology*, 639 S.W.3d at 658 (citation and quotation marks omitted); *accord Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016). Indeed, SLAPPs typically "come camouflaged as any number of an array of different civil tort claims" which "contributes to many parties', attorneys', and judges' inability to recognize them." Colin Quinlan, *Erie and the First Amendment: State Anti-SLAPP Laws in Federal Court after Shady Grove*, 114 COLUM. L. REV. 367, 670 (2014) (citations and quotation marks omitted).

This case, however, is unique. Its filer, Mr. Johnson, has effectively *admitted* that this case is a SLAPP, brought with the aim of stifling the speech of his critic, Ms. Griffin. On April 7, 2023, Mr. Johnson was asked by a user on Twitter how his lawsuit against Ms. Griffin was going. In response, Mr. Johnson did not say that his lawsuit was going well because he expected to prevail on the merits of his claims. He did not say that his lawsuit was going well because he looked forward to receiving

compensation for having been terminated from his job. Rather, Mr. Johnson said that his lawsuit was going well because Ms. Griffin had not "mentioned any private citizen by name online since 2021," an accomplishment he further described as a "[b]ig win for the common folks."[2]



In this Tweet, Mr. Johnson has effectively conceded that his aim in this lawsuit is to silence his opponent's speech. Put another way, Mr. Johnson has effectively admitted that this case is a SLAPP.

---

[2]  Undersigned counsel personally took the screenshots of each of Mr. Johnson's Tweets included in this brief.

But even beyond Mr. Johnson's public admission (which alone should settle the question), this case bears additional hallmarks of a SLAPP. Most critically, and like all SLAPPs, the Johnsons' claims are legally meritless, as Ms. Griffin's merits brief ably explains. Appellee's Br. 24-45. And as this brief explains, the Johnsons' claims are also meritless because facts that would undoubtedly come out during discovery undercut the Johnsons' narrative about what actually occurred on April 24, 2021—so much so that it is reasonable to conclude that they filed this lawsuit never actually intending to win. That is another hallmark of a SLAPP. In addition, the types of claims pleaded here— tortious interference, invasion of privacy, and intentional infliction of emotional distress—are precisely the types of claims a typical SLAPP filer uses.

But first things first: The district court correctly dismissed the Johnsons' complaint for lack of personal jurisdiction over Ms. Griffin. Put simply: Courts' analyses of personal jurisdiction in cases involving online speech should take into account the unique speech-enabling role that the Internet plays in Americans' daily lives. If simply commenting online about events in another state—which is all Ms. Griffin did—were enough

to confer personal jurisdiction, many Internet users might be subjected to SLAPPs like this one in states halfway across the country. The Johnsons' jurisdictional argument would accordingly chill an immense amount of protected online speech. The Supreme Court case on which the Johnsons primarily rely in support of their jurisdictional argument, *Calder v. Jones*, 465 U.S. 783 (1984), did not take the Internet's unique characteristics into account. Nor could it have. *Calder* was decided years before the Internet was available to average people.

For these reasons, the reasons set forth in Ms. Griffin's brief, and the reasons set forth below, this Court should affirm.

## ARGUMENT

## I.    The District Court Was Correct That Ms. Griffin's Online Comments Did Not Confer Personal Jurisdiction.

Because of the Internet's unique speech-enabling properties, it already receives special protections not applicable to offline speech. Adapting offline conceptions of jurisdiction to online spaces—as the Johnsons urge this Court to do—would chill an immense amount of valuable online speech, including subjecting Internet users to meritless SLAPPs like this one in courts far away from home.

A.   **The Internet Is Uniquely Speech-Enabling, and for That Reason, Congress and the Courts Have Given Online Speech Special Protections.**

The Internet has fundamentally transformed human communication. The "vast democratic forums of the Internet" have allowed "any person with [an Internet connection] [to] become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868-70 (1997).

Social media has fulfilled—and amplified—the promise of "relatively unlimited, low-cost capacity for communication of all kinds." *Id.* at 870. As of 2021, 72% of all Americans used some form of social media. *Social Media Use in 2021*, PEW RESEARCH CENTER (Apr. 7, 2021)*, https://tinyurl.com/3sxkp9br (last visited June 8, 2023). In March 2023, 69% of users reported using social media daily, and 89% of users reported using social media at least once per week. Statista, Social network usage by frequency in the U.S. as of March 2023, https://tinyurl.com/5n7zap73 (last visited June 8, 2023). In this "modern public square," *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017), users have the unprecedented ability to instantly communicate and share their thoughts about any

topic imaginable with friends, family, and complete strangers across the globe—for free.

Consequently, the information that we consume no longer comes overwhelmingly from large institutional gatekeepers; rather, it increasingly comes from each other. Through social media, users can bring mass awareness to events and causes, the powerless can hold the powerful accountable, the oppressed can shine a light on unseen injustice, and the marginalized can find community and voice.

In short, our world has grown smaller. Because of the Internet—and social media in particular—we know more than ever about what is happening in the world around us, and what our fellow citizens are doing and thinking. That knowledge can move us to relate to, and care about, issues and events arising far from home. And it enables us to discuss, organize, criticize, and effectuate change on a collective level never before possible. The importance of these speech-enabling advancements requires caution and careful consideration of their novel attributes by the courts so as not to inhibit their continued development and societal benefits.

On the one hand, online speech is generally afforded at least the same First Amendment protection as offline speech. *Reno*, 521 U.S. at 870 ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]."); *see also Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("[W]hatever the challenges of applying the First Amendment to ever-advancing technology, the basic principles of freedom of speech … do not vary when a new and different medium for communication appears." (internal citation and quotation marks omitted)).

On the other hand, the Internet is *different*. Laws, regulations, and doctrines developed for a system where mass communications were reserved for the elite few are not easily transposed to a world where anyone can transmit their thoughts, instantaneously and for free, to a global audience. Subjecting online speech to the same legal regimes as offline communication would stymie the development of these new, far-reaching, and accessible modes of communication. Consequently, legislatures, regulatory agencies, and courts have treated online speech differently. And in so doing, they have accounted for its unique

characteristics and exhibiting a policy preference towards protecting the promise of democratized, vibrant, and unfettered discourse.

### 1. Section 230.

One example of the special protection afforded to online speech is Section 230 of the Communications Decency Act of 1996. 47 U.S.C. § 230. To avoid the chilling effect of broad tort liability and "encourage the unfettered and unregulated development of free speech on the internet," *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003), Section 230 altered the common law by immunizing online services from liability based on content provided by third parties. Section 230's protection is broad, immunizing against even claims that do not sound in defamation. *See* Eric Goldman, *Why Section 230 is Better Than the First Amendment*, 95 Notre Dame L. Rev. Reflection 33, 36-37 (2019).

Section 230 also protects *users* of online services from liability based on content created by others. *See* 47 U.S.C. § 230(c)(1). Thus, in contrast with offline defamation liability principles, an online speaker who republishes defamatory information provided by another online speaker is shielded from liability. *See Monge v. Univ. of Pa.*, 2023 WL 2471181 at *2 (E.D. Pa. Mar. 10, 2023) (collecting cases); *Directory Assistants, Inc. v.*

*Supermedia, LLC*, 884 F. Supp. 2d 446, 451 (E.D. Va. 2012) ("a user …
who finds and forwards via email that content posted online … by others
is immune from liability.").

### 2.    The FEC's "Internet Freedom Rule."

Another example of the special protection afforded to online speech
is the Federal Election Commission's (FEC's) Internet Freedom Rule. In
the offline world, communications intended to influence the outcome of a
federal election must include a disclaimer identifying who paid for the
communication, and the maker of the communication must report the
expenditure to the FEC. 11 C.F.R. §§ 10.11, 110.16, 109.10.

In the online world, the rules are different. In 2006, the FEC
enacted the "Internet Freedom Rule." 11 C.F.R. § 100.155. Distinguishing
the Internet from traditional high-cost fora available only to the few, and
recognizing the importance of unfettered online political expression, the
rule exempted political content posted online for free, so that citizens
could share their political opinions and beliefs without being chilled by
onerous regulatory requirements.

### 3.    Statements of Fact vs. Opinion.

Judges, too, have accounted for the unique characteristics of online speech, particularly in assessing whether an allegedly defamatory statement is a statement of fact or opinion. "The culture of Internet communications, as distinct from that of print media … has been characterized as encouraging a freewheeling, anything-goes writing style." *Sandals Resorts v. Google, Inc.*, 86 A.D.3d 32, 43 (N.Y. App. Div. 2011) (internal citation and quotation marks omitted).

The nature of the free and open forum of the Internet, often used as a venue to speak anonymously and characterized by a looser, more hyperbolic vernacular, has persuaded some courts to conclude that readers are unlikely to interpret Internet postings as statements of fact. *See, e.g.*, *Ganske v. Mensch*, 480 F. Supp. 3d 542, 552-53 (S.D.N.Y. 2020) (the informal and unedited nature of online speech "leads readers [to] give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts"), *Bellavia Blatt & Crossett, P.C. v. Kel & Partners, LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015) ("New York courts have consistently protected

statements made in online forums as statements of opinion rather than fact.").

**B.    Courts Should Consider First Amendment Concerns in Cases Like This One, in Which the Claims Arise from Online Speech.**

Just as subjecting online speech to familiar liabilities and regulations threatened to stifle the evolution of new speech technologies, failing to account for the fundamental differences between online and offline communications in jurisdictional analyses threatens to undermine the Internet's profound speech-enabling effects.

**1.    *Calder* Does Not Fit the Realities of Online Speech.**

The Johnsons rely heavily on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), calling it "the most relevant judicial precedent for the case at bar." Appellants' Br. 23. The Johnsons are wrong.

For one thing, *Calder*'s "effects test" has been roundly criticized by scholars, *see* Alan M. Trammell & Derek E. Bambauer, *Personal Jurisdiction and the Interwebs*, 100 CORNELL L. REV. 1129, 1142 (2015), and as Ms. Griffin explains, narrowed significantly by the courts. Appellee's Br. 25-28. Properly so. *Calder* was decided in 1984, long before

the Internet was publicly available, and even longer before it became a dominant form of communication. At the time *Calder* was decided, few other than media defendants were likely to ever face a lawsuit over their expression in a foreign jurisdiction. Most everyday people were more likely to speak about matters of local interest, and their discussion of even non-local issues had relatively limited reach.

Today, we live in a digital fishbowl. Events, people, and issues that previously would have been matters of strictly local interest may capture the attention of the whole world. *See* Jon Ronson, *So You've Been Publicly Shamed* (2015) (discussing the ordeal of Justine Sacco, whose poorly worded Tweet to her 170 followers went viral). And the Internet allows us to discuss and debate those topics with a global audience. These broadening expressive horizons have had a profound, frequently positive, effect on our society. But they also carry a risk: as speech expands in scope and reach, so does its impact, exposing ordinary users to the types of lawsuits from subjects of criticism previously endured primarily by the media. But unlike media defendants, ordinary citizens often lack the resources and ability to mount a defense, especially in far-away jurisdictions. The prospect of ruinous litigation is more likely to cause

ordinary users to self-censor, avoid controversial topics, and refrain from criticizing the powerful—reversing the Internet's democratization of expression. Put simply, the stakes are now higher.

Although *Calder* "reject[ed] the suggestion that First Amendment concerns enter into the jurisdictional analysis," 465 U.S. at 790, its reason for doing so has proven dubious in retrospect. The Court first asserted that imposing First Amendment limitations would "needlessly complicate an already imprecise inquiry." *Id.* But as it turns out, reversing the trend towards considering First Amendment concerns, *see* Juanita Darling, *Forum Shopping and the Cyber Pamphleteer: Banamex v. Rodriguez*, 8 COMM. L. & POL'Y 361, 370 (2003), may have only complicated things further. *See* Cassandra Burke Robertson, *The Inextricable Merits Problem in Personal Jurisdiction*, 45 UC DAVIS L. REV. 1301, 1310 (2012) (noting that courts "have had particular difficulty with effects-test cases" and that "decisions applying the effects test are often conflicting and contradictory, and efforts to smooth the inconsistent doctrine have been largely ineffective").

## 2. *Calder* Did Not Take Into Account Procedural Chilling Effects Like SLAPPs.

Second, and more importantly, *Calder* dismissed the need to consider the First Amendment because "the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits. … To reintroduce those concerns at the jurisdictional stage would be a form of double counting." 465 U.S. at 790 (internal citations omitted).

But in fact, the Court *under*-counted the First Amendment concerns. While constitutional limitations on speech torts account for the chilling effect of imposing *liability*, they do nothing to account for the chilling effect of imposing *litigation*. That chilling effect, unaccounted for by *Calder*, came to the fore in the years immediately following the decision, as awareness of SLAPPs began to grow. The animating concern over SLAPPs was precisely the First Amendment harm that the *Calder* Court ignored:

> [SLAPPs] forc[e] the target into the judicial arena where the SLAPP filer foists upon the target the expenses of a defense. The longer the litigation can be stretched out … the greater the expense that is inflicted and the closer the SLAPP filer moves to success. … Persons who have been outspoken on

> issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined.

*Gordon v. Marrone*, 590 N.Y.S.2d 649, 656 (Sup. Ct. 1992). Although the First Amendment may ultimately hand a SLAPP target a victory on the merits, the damage has been done: *the process is the punishment*. And the costs imposed on SLAPP targets are substantial indeed, especially to ordinary Internet users: a recent calculation estimates the cost of defeating a meritless defamation lawsuit at between $21,000 and $55,000. David Keating, *Estimating the Cost of Fighting a SLAPP in a State with No Anti-SLAPP Law*, INSTITUTE FOR FREE SPEECH, June 16, 2022, https://tinyurl.com/eeb4tush.

Recognizing the grave harm that even meritless litigation can pose to protected speech, state legislatures began enacting anti-SLAPP laws as early as 1989. *See, e.g.*, 1989 WASH. SESS. LAWS 1119-20. Unfortunately, anti-SLAPP laws provide little comfort to defendants in federal court, as there is not yet a federal anti-SLAPP statute, and the availability of state anti-SLAPP law in federal court is limited to a tiny minority of federal jurisdictions. *See* Shannon Jankowski & Charles Hogle, *SLAPP-ing Back: Recent Legal Challenges to the Application of*

*State Anti-SLAPP Laws*, COMMUNICATIONS LAWYER (Mar. 16, 2022), https://tinyurl.com/3ubc7u93.

### 3. The Johnsons' Broad Jurisdictional Theory Would Chill Online Speech.

The Johnsons' jurisdictional argument, distilled to its basics, is that merely talking about someone online subjects the speaker to jurisdiction in the subject's home state. This approach would chill an immense amount of online speech.

The Johnsons contend that Ms. Griffin's Tweets were "specifically directed" at Tennessee in several ways. First, the Johnsons point out that the tweets identified them by name, revealed general biographical information about them, and referenced two cities in Tennessee. Appellants' Br. 14-15. Doctrinally, this clearly is not enough. *See* Appellee's Br. 18-20. And so, to shore up their argument, the Johnsons argue that the Tweets relate to events that occurred within Tennessee, evoking *Calder*'s "focal point" determination. Appellants' Br. 13, 17, 22. But the location of the conduct referenced in Ms. Griffin's Tweets does not add much. Every happening happens *somewhere.* If this sufficed, a speaker who comments on any particular action or event would be subject

to personal jurisdiction in the state where it occurred, so long as they identified the plaintiff in connection with it.

Hailing speakers into a foreign jurisdiction's court merely because the topic of their expression is or was located there would chill online speech by making it significantly riskier to comment on, or criticize, people and events outside one's home state. For example, should every Internet user have to fear litigating in a Washington, D.C. court if a member of Congress wakes up one morning with thin skin? The criticism is likely to both identify the official and relate to their actions at the Capitol. Such a result would certainly contradict our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The Johnsons further argue that Ms. Griffin specifically directed her Tweets to Tennessee because they were aimed at a Tennessee audience, rather than a global audience. In support, they point to Ms. Griffin's first Tweet, claiming that Ms. Griffin "tweeted directly to a Tennessee citizen [i.e., VisuWell] … [and] linked directly to VisuWell's Twitter account." Appellants' Br. 17.

But all Ms. Griffin actually did was *mention* VisuWell. On Twitter, users can refer to each other by inserting "@username" into the body of their Tweet in two ways. If a Tweet *begins* with an @username, that is known as a Reply, and Twitter recognizes the Tweet as a conversation with that particular user, limiting its visibility to a smaller group. George Tinari, *Why do People Put Periods Before Usernames on Twitter?*, GUIDING TECH (Apr. 19, 2023), https://tinyurl.com/v2u9m5mw. But when an @username is inserted later in the Tweet, that is known as a Mention. Mentions are displayed to all the author's followers—and the Mention is transformed into a link to the mentioned account's profile. Corinna Essa, *How to Effectively Use Twitter Mentions and @Replies for Marketing*, SOCIAL MEDIA WORLDWIDE, https://tinyurl.com/49wxhf8m. A Reply indicates the user's desire to engage a specific other user in conversation. By contrast, a Mention indicates that the author is talking *about*, or *referring to*, another Twitter user. Ms. Griffin's first Tweet contained a Mention of VisuWell. It referred to and identified VisuWell as part of the information that the Tweet conveyed; it did not seek to start a direct conversation with the company. As a result, the Johnsons' insinuation that Ms. Griffin reached out directly to a Tennessee resident in her first

Tweet is incorrect. Rather, the Tweet was—as the Johnsons also characterize it—a "link."

And that characterization actually weakens the Johnsons' argument. Links serve a critical purpose on the Internet: they are how the Internet is traversed. Links allow users to jump from page to page, exploring relevant materials and discovering new information. "Hyperlinks are the signature characteristic of the World Wide Web … [that] can help readers understand an issue in depth … and can also increase the user's ability to control the information-seeking process." *Adelson v. Harris*, 402 P.3d 665, 668-69 (Nev. 2017) (internal citations and quotation marks omitted).

Ms. Griffin's Tweet did nothing more than identify an account that she deemed relevant. At most, Ms. Griffin's Tweet encouraged others to look into, or talk about, VisuWell and its connection to Mr. Johnson and the events of April 24, 2021. Predicating jurisdiction for tort claims on nothing more than encouraging others to engage in constitutionally protected activity simply cannot be squared with First Amendment values.

A closer jurisdictional call might present itself had Ms. Griffin expressly encouraged readers to commit some wrongful act. *See, e.g.*, *Lord v. Smith*, 2023 WL 3792450 (N.D. Ill. June 2, 2023) (jurisdiction proper where the defendant assisted Internet users in finding the plaintiff's address and encouraged them to threaten him with violence); *but see Broadvoice, Inc. v. TP Innovations LLC*, 733 F. Supp. 2d 219 (D. Mass. 2010) (no personal jurisdiction where the defendant encouraged readers of his website to file complaints against a Massachusetts business with various government agencies and the Boston Better Business Bureau). But that is not the case here. Ms. Griffin merely disclosed Mr. Johnson's basic—and publicly available—biographical information and commented on his behavior, noting that "it seems like he's dying to be online famous."

The words "online famous" at once illustrate the deficiency of the Johnsons' arguments and the dangers of adopting their broad theory of jurisdiction. Four of the Johnsons' seven counts complain of the virality alleged to have been caused by Ms. Griffin's Tweets. But "online famous," *by definition*, implicates a world wider than just a Tennessee audience,

evincing an intention to bring the incident to the *broader* public's awareness.

The Johnsons effectively ask this Court to define the word "online" as "Online Tennesseans." The Court should decline to do so, not only as a matter of common sense, but because exercising personal jurisdiction under these circumstances would effectively expose all participants in online discourse to abusive, speech-chilling litigation.

There is good reason for the Court to be mindful of First Amendment concerns and circumspect in permitting plaintiffs to drag defendants from every corner of the country to answer for their online expression. Prior to *Calder*, some courts had little difficulty imagining the chilling effect of extensive personal jurisdiction. "When dealing with a newspaper … the lack of substantial revenues derived from sales in distant forums [make it likely that] lawsuits will have a chilling effect upon the desire … to promote the distribution of publications expressing views unpopular in such forums." *Cutis Publishing Co. v. Golino*, 383 F.2d 586, 592 (5th Cir. 1967) (considering the First Amendment implications of exercising personal jurisdiction); *see also Gonzales v. The Atlanta Constitution*, 4 Media L. Rep. (BNA) 2146 (N.D. Ill. 1979)

("potential chilling effect on the exercise of First Amendment press freedoms that would result from requiring newspaper publishers to defend libel suits in every distant forum where a negligible number of copies of their newspapers are circulated constitutionally precludes the exercise of jurisdiction").

The Internet magnifies these concerns, and *Calder* itself illustrates the speech-chilling danger of broad determinations that online speech is "directed at" a forum. *Calder* reasoned that the National Enquirer's largest subscription base was in California, *i.e.*, it had a strong financial tie and a *profit motive* to target the forum. 465 U.S. at 785, 790. On social media, our overall "subscription base" is effectively *everyone*. We are shouting at the clouds, hoping that someone—anyone—hears us and chooses to care about what we are saying. We are seeking not to turn a profit, but to find human connection, information, and dialogue.

The risk is no longer that media defendants will abandon circulation wherever it does not have a strong financial incentive to defend against lawsuits. The risk is now that "procedural chilling" threatens the speech of nearly *all* Americans who utilize the unbounded, global forums of the Internet to engage on an increasingly broad array of

topics. As our capacity for expression grows, so too does the capacity for SLAPPs—such as this one—to undermine our willingness to express ourselves online.

## II. This Case Bears The Hallmarks of a Typical SLAPP.

Perhaps obviously, SLAPP filers like the Johnsons "do not describe themselves as such." 22 Causes of Action 2d 317 (2023 ed.). But even though SLAPPs do not announce themselves as SLAPPs, there are nonetheless telltale signs that this case is a SLAPP.

### A. The Johnsons' Claims Are Legally Meritless, Which Suggests This Case is a SLAPP.

The primary hallmark of a SLAPP is that the filer's claims are meritless. As Professors Pring and Canan—who first coined the term "SLAPP"—put it: "SLAPPs, as lawsuits go, are losers; the vast majority are ultimately dismissed." George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPS"): An Introduction for Bench, Bar and Bystanders*, 12 BRIDGEPORT L. REV. 937, 944 (1992)[3]; *see*

---

[3]  Thirty years ago, when they first proposed the term, Professors Pring and Canan limited the definition of a SLAPP to lawsuits designed to suppress First Amendment activity under the Petition Clause. *See, e.g.*, 12 BRIDGEPORT L. REV. at 946-47. Since then, however, most scholars and many legislatures have come to define "SLAPP" more broadly to include lawsuits designed to suppress First Amendment activity under the Speech Clause and Assembly Clause as well. For example, California's

*also Nandigam Neurology*, 639 S.W.3d at 658 ("SLAPPs are, by definition, meritless." (citation and quotation marks omitted)).

Ms. Griffin's merits brief ably sets forth why the Johnsons' claims are legally meritless. *See* Appellee's Br. 24-45. In the Johnsons' world, Ms. Griffin should be liable in tort for nothing more than making comments—themselves protected by the First Amendment—about *Mr. Johnson's own public behavior*. In the Johnsons' world, Ms. Griffin should be liable in tort for republishing a video of *Mr. Johnson's own public behavior*, even though the Johnsons do not dispute that the video contains no lies. But in the real world, the law does not work that way. *See, e.g.*, Restatement (Second) of Torts § 652B cmt. c (there is no intrusion upon seclusion for "taking … [a] photograph" of someone whose

---

Anti-SLAPP law defines the term as a lawsuit filed to stifle a "person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Code Civ. Proc. § 425.16. Similarly, the Uniform Law Commission's model Anti-SLAPP law defines a SLAPP as a "civil action against a person based on," among other things, "a person's … exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution … on a matter of public concern." Unif. Pub. Expression Prot. Act § 2(b) (Unif. L. Comm'n 2020). And Tennesse's Anti-SLAPP law defines a SLAPP as a lawsuit that arises in response to an "exercise of the right to free speech, right to petition, or right of association." Tenn. Code Ann. § 20-17-105(a).

"appearance is public and open to the public eye"); *id.* at § 652D cmt. b ("There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public."); *Armstrong v. NBC*, 2012 WL 4098984, at *2 (W.D. Ky. Sept. 17, 2012) ("[T]here can be no invasion of privacy when the plaintiff is engaging in conduct in a public place."); *Cousins v. Goodier*, 283 A.3d 1140, 1160 (Del. 2022) ("[W]hen a tortious inference claim rests on statements that are protected by the First Amendment and no additional improper conduct is alleged, the tortious interference claim must fail.").

### B. The Johnsons' Claims Are Probably Factually Meritless, Which Suggests This Case is a SLAPP.

The Johnsons' claims are not only legally meritless. They are also, in all likelihood, factually meritless. Had the district court allowed the Johnsons' claims proceed past the motion-to-dismiss stage, the information that inevitably would come to light during discovery—including the police report about the incident at the heart of the Johnsons' claims and Mr. Johnson's own Twitter feed—would in all likelihood fatally doom his claims down the road. That, in turn, suggests that Mr. Johnson's real motivation in filing this lawsuit was not to prevail on his claims, but to attempt to silence Ms. Griffin. *Ryan v. Fox*

*Television Stations, Inc.*, 979 N.E.2d 954, 959 (Ill. Ct. App. 2012) ("Plaintiffs in SLAPP suits do not intend to win but rather [intend] to chill a defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction."); John C. Barker, *Common Law and Statutory Solutions to the Problem of SLAPPS*, 26 Loy. L.A. L. Rev. 395, 406 (1993) ("Prevailing in the courts is not the goal of [SLAPP] plaintiffs. Rather, they seek to silence their critics.").

One piece of evidence that will surely come out in discovery should this case proceed is the police report from the night of April 24, 2021. The Johnsons' complaint and opposition to Ms. Griffin's motion to dismiss together attempt to craft a narrative that Mr. Johnson was, at best, an innocent bystander who was attacked by rowdy teens or, at worst, a concerned citizen who calmly requested that vile, "obnoxious," "vulgar[]" teens stop disturbing the peace and quiet of the hotel restaurant. Compl. ¶ 63, Dkt. 1 at 11, PageID.11. His complaint and briefing below strongly imply that the teens were the ones causing a scene (using words like "fracas" and "disturbance" throughout), while Mr. Johnson remained calm, cool, and collected despite the teens "berating" or "verbally

attacking" him. *See, e.g.*, Compl. ¶¶ 67, 69, Dkt. 1 at 12, PageID.12; Pls. Opp. to MTD, Dkt. 29 at 1-2, PageID.189-90.

The police report, however, tells an entirely different story. Although brief, the police report indicates that the restaurant called the police not because the teens were being rowdy, but because *Mr. Johnson* was in the courtyard "harassing some teens taking prom pictures" and "acting strange toward some of the female teens."

| Date | Time | User | Type | Conf. | Comments |
|------|------|------|------|-------|----------|
| 4/24/2021 | 18:54:48 | MHAMMONDS | Response | | [1] THERE IS A MALE SUBJ IN THE COURTYARD |
| 4/24/2021 | 18:55:00 | MHAMMONDS | Response | | [2] HE IS NOT TO BE ON THE PROPERTY AND HAS BEEN TOLD TO LEAVE |
| 4/24/2021 | 18:56:01 | MHAMMONDS | Response | | [3] SUBJ IS WHITE MALE LSW WHITE POLO SHIRT AND PANTS |
| 4/24/2021 | 18:56:14 | MHAMMONDS | Response | | [4] HE IS AT THE BAR NOW ON THE FIRST FLOOR |
| 4/24/2021 | 18:56:45 | MHAMMONDS | Response | | [5] SUBJ WAS HARASSING SOME TEENS TAKING PROM PICTURES IN THE COURTYARD AND HE WAS ACTING STRANGE TOWARD SOME OF THE FEMALE TEENS |
| 4/24/2021 | 18:59:08 | MHAMMONDS | Response | | [6] UNK IF THIS SUBJ IS A GUEST AT THE HOTEL OR NOT |
| 4/24/2021 | 19:07:59 | TPERRY | Response | | [7] STATUS CK |
| 4/24/2021 | 19:14:06 | TPERRY | Response | | [8] 445FK SUBJ HAS LEFT PER MGT REQ |

If this case were to proceed past the motion-to-dismiss phase, Mr. Johnson would have to contend with the police report, which reflects that hotel and restaurant employees were apparently so disturbed by *his* behavior that they called the police in response. That he filed this lawsuit in the first place while presumably knowing that this information would inevitably come out seriously undermines any notion that he filed this

-30-

lawsuit actually expecting to win. That, in turn, supports the conclusion that this lawsuit is a SLAPP.

Other evidence that would inevitably come out in discovery would be Mr. Johnson's long, and public, history of anti-LGBT views. The Johnsons' complaint laments the supposed lack of context for the actions captured on video, repeatedly pointing out the "deeply misleading" nature of the video, which the Johnsons contend was edited and presented out of context to imply that Mr. Johnson was bullying two teenage members of the LGBT community. *See* Compl. ¶¶ 3, 79, Dkt. 1 at 2, 15, PageID.2, 15. Mr. Johnson's Tweets provide quite a bit of context for his actions—though perhaps not the context he would prefer. His Tweets paint a picture of a man with strong anti-LGBT prejudices who is not afraid of voicing his thoughts for the entire world to see.

For example, Mr. Johnson on several occasions belittles the entire concept of Pride Month, the annual celebration in June honoring the LGBT community and its overcoming human-rights struggles throughout history. On June 1, 2022, Mr. Johnson Tweeted "This is the year that pride month dies. My pride is no less important than your pride."



Three days later, he mocked the concept of an HIV/AIDS organization offering free testing at a Pride event, saying "Let's kickoff [*sic*] #smoking month by knowing your lung cancer status!"



On June 2, 2021—less than two months after the incident underpinning this lawsuit—he mocked the concept of Pride Month again, writing "I've got a great corporate development idea! Let's take the entire month of June to celebrate your sex life and where you like to put your pee-pee. Sounds like a really productive exercise!"



From transgender issues—"I swear, if you try to tell my grandchildren they aren't the gender they were born with, I'll make you wish you had died of monkeypox."—to marriage equality—"Anything that attempts to erode or diminish the traditional family is evil."—he has for years voiced his anti-LGBT opinions in public.





**Sam Johnson** ✔
@SJohnsonTN

Anything that attempts to erode or diminish the traditional family is evil.

10:00 PM · Jun 7, 2022

But perhaps the most helpful context for Mr. Johnson's actions in the video is a Tweet from May 17, 2021—only about a month after the events underlying this lawsuit.



Thus, in Mr. Johnson's "observation," LGBT people living "freely and openly" are "usually" "loud and obnoxious." These are the exact same words he uses in his complaint to describe the LGBT teens at the restaurant on April 24, 2021. This, and all of his anti-LGBT Tweets, would surely come out in discovery should this case proceed. These Tweets contradict the Johnsons' narrative that Mr. Johnson's behavior on April 24, 2021 was not motivated by anti-LGBT bias.

At bottom, the facts that would inevitably arise in discovery here would in all likelihood fatally undercut the merits of Mr. Johnson's claims and serve to emphasize the fact that this case is nothing but an attempt to chill Ms. Griffin's constitutionally protected speech.

### C.   The Claims The Johnsons Pleaded Here Are Exactly the Types of Claims Pleaded in a Typical SLAPP.

In 1992, Professors Pring and Canan identified 228 SLAPPs and categorized the most common causes of action that filers used to disguise their SLAPPs as ostensibly legitimate claims. Among the most popular were "defamation"; "[b]usiness torts" like "interference with business" including interference with contractual relations; and "invasion of privacy." Pring & Canan, 12 BRIDGEPORT L. REV. at 947; *see also* Barker, 26 Loy. L.A. L. Rev. at 402 ("Many SLAPP claims are brought for

business torts, such as … malicious interference with contract rights."). Since then, other torts have joined business torts and privacy torts as the favored disguises for SLAPPs, including intentional infliction of emotional distress. *See, e.g.*, *Thomas v. Quintero*, 126 Cal. App. 4th 635, 657 (2005) (describing, among others, intentional infliction of emotional distress as a "weapon[] of choice in SLAPP suits"); *Sibley v. CarMax, Inc.*, 2020 WL 4050294 at *12 n.6 (Md. Ct. Spec. App. July 20, 2020) (noting the legislative finding in enacting Maryland's anti-SLAPP law that "common [SLAPP] causes of action include defamation, invasion of privacy, intentional infliction of emotional distress …. [and] interference with contract or economic advantage").

These are exactly the types of claims contained in the Johnsons' complaint—yet another sign this case is a typical SLAPP.  Compl. ¶¶ 107-152, Dkt. 1 at 28-33, PageID.28-33 (alleging claims for Tortious Interference With Employment Relations, Tortious Interference With Contractual Relations, Intentional Infliction of Emotional Distress, and Invasion of Privacy—Intrusion Upon Seclusion).

\*     \*     \*

In sum, all signs here point to SLAPP. Mr. Johnson's April 7, 2023 Tweet, essentially confirms it. *See* p. 5, *supra.* That the Johnsons' claims are meritless and that the Johnsons pleaded exactly the types of tort claims usually pleaded in a SLAPP further confirm it.

## CONCLUSION

This Court should affirm the judgment of the trial court.

June 14, 2023

Respectfully submitted,

Ari Cohn
TECHFREEDOM
1500 K. Street NW, Floor 2
Washington, D.C. 20005
acohn@techfreedom.org

Annie Avery
BRYAN CAVE LEIGHTON
  PAISNER LLP
1920 Main Street, Ste. 1000
Irvine, CA 92641
Annie.Avery@bclplaw.com

/s/ *Geoffrey M. Pipoly*
Geoffrey M. Pipoly
  *Counsel of Record*
BRYAN CAVE LEIGHTON
  PAISNER LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Geoff.Pipoly@bclplaw.com
(312) 602-5085

Jean-Claude André
  BRYAN CAVE LEIGHTON
  PAISNER LLP
120 Broadway, Ste. 300
Santa Monica, CA 60401
jcandre@bclplaw.com

Counsel for *Amicus Curiae*

-37-

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) and 32(a)(7)(B) because:

    ☒    this brief contains <u>6484</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 32(f), *or*

    ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2016</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐    this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* __ _____ with *(state number of characters per inch and name of type style)* _____ _____ _____.

                      <u>/s/ *Geoffrey M. Pipoly*</u>
                      Geoffrey M. Pipoly
                      *Counsel for Amicus Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on June 14, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Geoffrey M. Pipoly*
Geoffrey M. Pipoly
*Counsel for Amicus Curiae*